In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-03-00077-CR


______________________________








EX PARTE: GEORGE E. WERNE








 


On Appeal from the 76th Judicial District Court


Titus County, Texas


Trial Court No. 30241




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 In this appeal, we consider whether the untimely handling of one application for writ of
habeas corpus requires that a subsequent application for writ of habeas corpus be granted.

I. Background

 George E. Werne was arrested on September 2, 2002, for minor traffic and weapons offenses. 
Soon thereafter officials discovered Werne was wanted as a fugitive by the State of Mississippi. 
Werne satisfied his sentences on the Texas misdemeanor offenses by mid-September 2002, but
remained confined in the Titus County jail pursuant to the Mississippi warrant. Two months passed,
with Werne still in jail, without an attorney, and with no bond set, pending resolution of the
Mississippi fugitive warrant.

 On November 12, 2002, Werne filed a pro se application for habeas corpus relief (herein the
First Application) and declared his indigence. Over two months later, on January 15, 2003, a hearing
was conducted on the First Application. Following the hearing, the trial court released Werne on
a $5,000.00 personal recognizance bond. Meanwhile, Rick Perry, the Governor of the State of
Texas, issued a warrant for Werne's arrest based on the Mississippi fugitive warrant. On January 21,
2003, law enforcement officials executed the Texas Governor's warrant and rearrested Werne on the
Mississippi charges. During his second incarceration, Werne again asked for appointed counsel. 
This time the trial court granted his request, and Werne's appointed counsel filed a second
application for writ of habeas corpus (herein the Second Application) on February 12, 2003. A
hearing on the Second Application was conducted eight days later.

 Following the February 20 hearing, the trial court denied Werne's Second Application. The
trial court recognized that Werne had been illegally detained from December 2002 through January
15, 2003, but concluded the illegal detention did not taint the efficacy of the warrant issued by the
Governor of Texas for Werne's arrest based on the Mississippi charges.

 Werne appeals the trial court's denial of his Second Application. Werne's four points of error
on appeal assert the trial court erred by: (1) refusing to release Werne unconditionally on his First
Application, (2) not conducting a timely hearing on his First Application, (3) denying Werne's
Second Application in light of his prior illegal detention, and (4) by denying Werne's right to counsel
at the time he filed his First Application. For the reasons stated below, we affirm the trial court's
judgment.

II. Issues Related to the First Application

 In his first, second, and fourth issues, Werne challenges alleged errors in connection with his
First Application. Werne did not appeal the trial court's denial of relief on that application. The case
now before us is an appeal of the trial court's denial of Werne's Second Application. Because Werne
did not appeal the trial court's judgment on his First Application, we are without jurisdiction to
address those issues relating to the trial court's denial of the Second Application. See generally Tex.
R. App. P. 26.2(b); Ex parte Okere, 56 S.W.3d 846 (Tex. App.-Fort Worth 2001, pet. ref'd)
(discussing appellate jurisdiction to review merits of denial of habeas relief).

III. Issue Related to the Second Application

 In his third point of error, Werne contends the trial court erred by denying his Second
Application. In this Second Application, Werne sought to challenge his pretrial incarceration based
on the Texas Governor's warrant. Werne argues on appeal that the trial court's failure to grant relief
on his First Application deprived him of his constitutional right to liberty and that this deprivation
cannot be cured by subsequent issuance and service of a valid Governor's warrant.

 We agree with the trial court's subsequent acknowledgment that, in failing to release Werne
unconditionally after the first habeas corpus hearing, it erred. (1) The existence of error on the First
Application does not, however, resolve the issue presented in the case now before us-whether the
trial court erred in denying Werne's Second Application.

 Werne does not contest the propriety of the warrant issued by Governor Perry. Instead,
Werne argues that, in light of the fact the trial court erred so grievously by delaying a hearing on his
First Application for over two months, and then by releasing him only on a bond rather than granting
unconditional release as demanded by our law, this constituted an unconstitutional infringement on
individual liberty that cannot be rendered acceptable by an untimely Governor's warrant. We cannot
agree that a later, properly issued Governor's warrant should be disregarded.

 Werne takes the position that his second incarceration constitutes a form of constitutional
error because he was unlawfully jailed while the trial court disregarded his efforts to obtain the
freedom to which he was entitled. It is true that, if a liberty interest is created by a statute, due
process concerning that liberty interest requires notice and a meaningful opportunity to be heard. 
LaChance v. Erickson, 522 U.S. 262, 266 (1998); Ex parte Geiken, 28 S.W.3d 553, 560 (Tex. Crim.
App. 2000). In this case, Werne's liberty interests were denied in connection with the First
Application. (2) Werne asks this Court to recognize those errors in our review of the Second
Application and to penalize the trial court for its previous failures by directing that the State be
prohibited from enforcing the current Governor's warrant. The State suggests that we might instead
merely treat these as two separate proceedings and not consider one in reviewing the other. We
decline both invitations.

 We will not declare that there is no instance in which such an error might be so great as to
fatally corrupt a later proceeding. In this case, however, we do not so conclude. The error was
ultimately rectified, although at the cost of six unnecessary weeks in jail for Werne. That error,
however, has not contaminated the present proceeding, which involves a proper Governor's warrant
and arrest pursuant to that warrant. Cf. Lanz v. State, 815 S.W.2d 252, 254 (Tex. App.-El Paso
1991, no pet.).

 Even were we to find it proper to fully merge these two proceedings and apply the rule
controlling our review of harm resulting from error of constitutional magnitude, we would not find
reversible error. In such a review, we must reverse the judgment of the trial court unless we
determine beyond a reasonable doubt the error did not contribute to the conviction. (3) When
performing this analysis, the Texas Court of Criminal Appeals has held that the following factors
are to be considered: 1) the source of the error; 2) the nature of the error; 3) whether the error was
emphasized and its probable collateral implications; 4) the weight a juror would probably place on
the error; and 5) whether declaring the error harmless would encourage the State to repeat it with
impunity. Orona v. State, 791 S.W.2d 125, 130 (Tex. Crim. App. 1990). No single factor is
dispositive. Instead, the existence and severity of these factors are indicative of the harm caused by
the improper conduct. Wilson v. State, 938 S.W.2d 57, 61 (Tex. Crim. App. 1996); Wead v. State,
94 S.W.3d 131, 137 (Tex. App.-Corpus Christi 2002, pet. granted).

 In this case, only the first and fifth factors are implicated by this analysis. The source of the
error was evidently the court itself. That alone is of substantial importance. The fifth factor is
whether declaring this behavior harmless would encourage the court to repeat it, confident that it
could do so with impunity. We are not convinced the trial court would choose to act in such a
fashion. The judicial system rests on our trial courts' timely and correct application of the law, and
in the absence of any indication that the error by this trial court was intentional, as opposed to
accidental or inadvertent, we are unwilling to assume the trial court would willfully ignore the law. 
We therefore find no harm.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: September 3, 2003

Date Decided: September 11, 2003
1. Our law permits someone who is incarcerated to file a pretrial application for writ of habeas
corpus. Tex. Code Crim. Proc. Ann. arts. 11.08, 11.09 (Vernon 1977). Once an application for
pretrial habeas corpus relief is filed, the trial court must schedule a hearing on the application for the
earliest day which the trial court can devote to a hearing on the application. Tex. Code Crim. Proc.
Ann. arts. 11.10, 11.11 (Vernon 1977). In the case of Werne's First Application, the trial court
waited more than two months between the time Werne filed his application and the time the trial
court conducted a hearing. We believe this two-month delay was presumptively unreasonable,
especially when Werne had been confined since September 2, 2002. The delay demonstrated an
abuse of discretion by the trial court in scheduling its docket. 

 Furthermore, our Legislature has mandated the release of any fugitive confined for more than
ninety days but not arrested pursuant to a warrant issued by the Governor of Texas. See Tex. Code
Crim. Proc. Ann. art. 51.07 (Vernon 1979). By the time the trial court conducted a hearing on
Werne's First Application, Werne had been an unwilling guest of the Titus County jail for more than
120 days. The record shows Titus County officials had not received a valid warrant issued by the
Governor of Texas on January 15, 2003. Accordingly, the trial court should have released Werne
without any restriction at the conclusion of the hearing. Tex. Code Crim. Proc. Ann. arts. 51.07,
51.08 (Vernon 1979); Ex parte Steel, 155 Tex. Crim. 93, 230 S.W.2d 233 (1950); see also Lanz v.
State, 815 S.W.2d 252, 254 (Tex. App.-El Paso 1991, no pet.). This, however, is not what the trial
court did; it instead placed Werne on a $5,000.00 personal recognizance bond with instructions not
to leave Titus County. Werne was rearrested on a Governor's warrant six days later.
2. Our law creates a liberty interest by requiring the release of an incarcerated individual unless
specific conditions are met. The trial court violated Werne's constitutional rights by failing to act
in a timely and appropriate manner in accordance with the statutory requirements, thus depriving him
of  his  liberty  without  due  process  of  law.  Ex  parte  Barnett,  600  S.W.2d  252,  254  (Tex.
1980); In re Butler, 45 S.W.3d 268, 270 (Tex. App.-Houston [1st Dist.] 2001, orig. proceeding).
3. Tex. R. App. P. 44.2(a).



ly higher than the month and date.

 There was substantial evidence from which the jury could conclude the temporary license in
Shipp's wallet was forged: there are visible inconsistencies in the document, plus Walker's testimony
that the name and identifying number on the document do not coincide.

 There may be, however, some question of whether the evidence sufficiently proves Shipp
possessed the license with intent to harm or defraud or to utter. The State offers no caselaw to argue
the evidence was sufficient to show Shipp had intent to harm or defraud, (7) or intended to utter the
temporary license. Shipp offers no authority to question whether intent was proven. 

 In argument before the trial court, the State claimed that Carol had testified that Shipp had
"forged for her" the altered driver's license Carol presented to Bohler. Actually, though, at trial Carol 
said that her permanent driver's license "had another number over the top of it." As for how that
label came to be present, she said, "It was printed out on a label. I put it on top of it." She denied
falsifying any other licenses, and claimed that shortly (8) before Allen's trial, when she pled to two
felony charges, she then falsely accused Shipp of having falsified her driver's license. We point out
that this is one of the numerous times in Carol's testimony where, from the context of the State's
questioning and her answers, she appeared to contradict if not refute statements she had made at her
plea hearing two weeks before testifying at Shipp's trial. Obviously, the jury was in the best position
to weigh Carol's credibility and to believe some, all, or none of her testimony. See Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979) (stating jury is exclusive judge of 
facts and of weight given to testimony); Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App.
2008). 

 The intent to defraud or harm another may be established by circumstantial evidence. 
Williams v. State, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985). Here, there were ample suspicious
circumstances on which a rational jury could find, beyond a reasonable doubt, that Shipp possessed
the temporary license with intent to harm or defraud: both Shipp's possessing two forged or
suspicious licenses, the similarities in the temporary licenses, the presence of forged Wal-Mart
receipts, and the defaced or altered appearances of both Carol's and Shipp's permanent driver's
licenses. Similarly, despite the testimony of Shipp's mother as to the origin of the temporary license,
we cannot say that the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. 

 As for Shipp's possessing the license with intent to utter it, neither side offers authority one
way or another. We have found no cases addressing the intent to utter as it pertains to driver's
licenses or similar identification documents. But just as intent to harm or defraud can be proven by
circumstantial evidence, intent to utter can be proved in the same manner. Just as there is, in this
record, ample evidence of intent to harm or defraud, the same evidence is ample evidence of intent
to utter. The contrary evidence does not outweigh the evidence tending to prove intent to utter.

 We find the evidence to be both legally and factually sufficient to support the verdict, and
overrule Shipp's points of error challenging the evidence.

 As modified to provide that the sentence will run concurrently with the sentence in cause
number 06-08-00122-CR, we affirm the judgment in this case.






 Josh R. Morriss, III

 Chief Justice


Date Submitted: April 27, 2009

Date Decided: July 23, 2009


Publish
1. We find the trial court's charge to the jury used in this case to have been in substantial if not
complete compliance with the applicable law, and thus, the equivalent of a hypothetically correct
charge. 
2. (A) to alter, make, complete, execute, or authenticate any writing so
that it purports:

 (i) to be the act of another who did not authorize that act;

 (ii) to have been executed at a time or place or in a numbered sequence 
 other than was in fact the case; or

 (iii) to be a copy of an original when no such original existed;


Tex. Penal Code Ann. § 32.21.
3. "
(B) to issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that
is forged within the meaning of Paragraph (A)." Tex. Penal Code Ann. § 32.21.
4. We refer the reader to our opinion in cause number 06-08-00122-CR for a detailed recitation
of activities leading to Shipp's arrest.
5. With the Shipps at Wal-Mart was their daughter, Courtney Butner. There is no indication
that there was any relation between Courtney Butner and anyone named Dan Butner.
6. Initially, Walker said when he ran Carol's temporary license, it pointed to someone named
Muelstein in Terrell; he later indicated to some confusion, but that, in fact, it was the Butner license
from Allen's wallet that had the number that pointed to Muelstein, and that Walker was not sure if
he ever ran the number on Carol's temporary license. Bohler said that she ran the number on Carol's
permanent license and it pointed to a woman from Houston.
7. There is a provision in Section 32.21 that provides a presumption of intent to harm or
defraud:


 A person is presumed to intend to defraud or harm another if the person acts with
respect to two or more writings of the same type and if each writing is a government
record listed in Section 37.01(2)(C).


Tex. Penal Code Ann. § 32.21(f). The State asserts, without subsequent argument or authority,
that this presumption applies. Neither party to the instant appeal addresses whether a temporary and
permanent license constitute "two or more writings of the same type," and we have found no cases
addressing this definition. See Tex. Penal Code Ann. § 32.21(f). It is true that Shipp was in
possession of two driver's licenses, one "permanent," or a typical plastic identification card with his
name and picture, but which appeared to have information "ground off"; and the temporary license
in the name of a person named Butner, but with an identification number corresponding to a third
person. It is also true that the temporary license in Carol's name, found in the center console, had
much data identical to that on the "Butner" temporary license. Because we find legally and factually
sufficient evidence to establish Shipp's intent to defraud or harm another, we do not find it necessary
to evaluate whether the presumption applies.
8. The State's question at that point in the testimony was actually, "That wasn't your story a
couple of days ago, was it?" However, throughout the rest of the questioning of Carol, multiple
references were made to her testimony at her plea hearing on or around May 1, 2008, approximately
two weeks before Shipp's trial.